## NORTH AMERICAN MERCANTILE CO. v. UNITED STATES

**No. 5680.**—Invoices dated Yokohama, Japan, October 22, 1936, etc.
Entered at San Francisco, Calif., December 29, 1936, etc.
Entry No. 6132, etc.

(Decided June 29, 1942)

*Lawrence & Tuttle (George R. Tuttle* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard H. Welsh, James F. Donnelly,*
and *Samuel D. Spector,* special attorneys), for the defendant.

DALLINGER, Judge: These appeals to reappraisement involve the question of the dutiable value of certain canned minced clams exported from Japan in January 1935, February and October 1936, and December 1937. All of said merchandise was entered at the port of San Francisco. In reappraisement appeals 119515–A, 119537–A, and 121980–A the merchandise was invoiced at 8.50 yen per case, and in reappraisement appeal 127027–A at 9 yen per case. All of said merchandise was entered under duress at $5.45 per case, less 1½ per centum discount, except reappraisement 119537–A which was entered at $5.319, and all were appraised as entered.

The merchandise was invoiced on the basis of export value, and was appraised on the basis of American selling price, in accordance with the provisions of the Presidential proclamation, dated May 1, 1934, promulgated in T. D. 47031, 65 Treas. Dec. 736, pursuant to the provisions of sections 336 and 402 (g) of the Tariff Act of 1930. The pertinent provisions of said Presidential proclamation read as follows:

Whereas under and by virtue of section 336 of title III, part II, of the act of Congress approved June 17, 1930, * * * the United States Tariff Commission has investigated the differences in costs of production of, and all other facts and conditions enumerated in said section with respect to, clams, packed in airtight containers, being wholly or in part the growth or product of the United States and of and with respect to like or similar articles wholly or in part the growth or product of the principal competing countries;

\* \* \* \* \* \* \*

Whereas the Commission has found it shown by said investigation * * * that the principal competing country for clams other than razor clams, * * * packed in air-tight containers, is Japan, and that said difference with respect to these articles cannot be equalized by proceeding under the provisions of subdivision (a) of said section and act;

\* \* \* \* \* \* \*

Whereas in the judgment of the President such * * * ad valorem rate of duty based upon said American selling price are shown by such investigation of the Tariff Commission to be necessary to equalize such differences in costs of production;

Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, do hereby approve and proclaim * * * assessment of the rate of

35 per centum ad valorem expressly fixed in said paragraph, title, and act on clams other than razor clams, * * * packed in air-tight containers, upon the American selling price, as defined in section 402 (g) of said act, * * *.

## The pertinent provisions of said section 336 read as follows:

(b) CHANGE TO AMERICAN SELLING PRICE.—If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402 (g)) of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

(c) PROCLAMATION BY THE PRESIDENT.—The President shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, if in his judgment such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production.

## Section 402 (g) of the Tariff Act of 1930 reads as follows:

(g) AMERICAN SELLING PRICE.—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

At the first hearing, held at San Francisco on February 13, 1941, before Tilson, Judge, the plaintiff offered in evidence the testimony of Harry L. Wiedner, United States examiner at the port of San Francisco, who testified that he had passed upon the merchandise covered by the within appeals; that said merchandise consisted of canned minced hokki clams; and that he appraised said merchandise on the basis of the American selling price of such or similar merchandise sold in San Francisco.

The witness then proceeded to testify in part as follows:

By Mr. TUTTLE:

Q. What was the similar merchandise, or the merchandise you have just referred to as being "such" merchandise?—A. On the whole butter clams from Washington.

Q. You just told us that you appraised this on the basis of whole butter clams sold in San Francisco?—A. That is right.

* * * * * * *

Q. What clam was that?—A. The whole butter minced.

* * * * * * *

Q. What was the size of the container of the minced whole butter clams used as the basis of appraisal here?—A. 7 ounce.

Q. 7 ounce drained weight of minced clams?—A. Yes.

* * * * * * *

Q. Will you tell us the basis of your appraisal, and in that statement tell us what clam, the clam packed by what packer?—A. That is impossible to answer, and I think you know that also. The clams come from Washington. I appraised on the price sold here by the various dealers in the principal market. I can't tell you the canneries. I never was in Washington before on this investigation. I deal in the market in San Francisco.

Q. I take it then that your appraisal was not based upon offers for sale of any particular manufacturer or producer?—A. As far as I know, no.

Q. But simply on what you found to be ——?—A. The wholesale market value in San Francisco on those dates.

\* \* \* \* \* \* \*

Q. Was it the price at which the clams were sold by packers to wholesalers?—A. To dealers from the wholesaler.

At the conclusion of the witness' testimony, the motion of counsel for the plaintiff, without objection, that the case be transferred to Seattle, was granted.

At the second hearing, held at Seattle on July 9, 1941, before Walker, Judge, the plaintiff again called as a witness, Harry L. Weidner, United States examiner of merchandise at the port of San Francisco, who testified that in the case of reappraisement appeal 119515–A, the entry No. 6132 covered 40 cases of minced clams, and that only 1 case was designated by the collector and examined by the appraiser; that in reappraisement appeal 119537–A, the entry No. 10097 covered 150 cases, and that according to the summary sheet only 1 case was designated by the collector and examined by the appraiser; that in reappraisement appeal 121980–A, the entry No. 7663 covered 175 cases and that only 1 was examined by the appraiser; and that in reappraisement appeal 127027–A, out of the 96 cases covered by entry 8317 only 1 case was examined.

At the conclusion of the witness' testimony the case was continued to the next Seattle docket.

At the third hearing, held at Seattle on November 10, 1941, on motion of counsel for the plaintiff the invoices, entries, and summary sheets in all of the within appeals were admitted in evidence.

At this hearing it was stipulated, subject to reservation by counsel for the Government, that said stipulation might be revoked on advice of the examiner at San Francisco, that in case the court should find that the merchandise covered by said appeals is not dutiable on the basis of the American selling price as defined in said section 402 (g), then the invoice values properly represent the export values of the merchandise herein, there being no higher foreign values. No objection having been subsequently made by counsel for the Government, at the next hearing in San Francisco, after consultation with said Government examiner at that port, I hereby hold that the said stipulation is in full force and effect.

Counsel for the plaintiff then called the attention of the court to the fact that the official papers disclosed that the collector had failed

to designate and the appraiser had failed to examine at least 1 out of every 10 cases of the canned minced clams involved herein and covered by these appeals, and insisted that the appraisements herein be declared null and void; and that there existed no presumption of correctness regarding the price of $5.45 per case, less 1½ per centum discount, as representing the American selling price of like or similar merchandise.

Counsel for the plaintiff then moved that the within appraisements be held to be null and void, and the motion was taken under advisement by the trial judge.

It was then stipulated by and between counsel for the respective parties in open court that at the time of the exportation of the instant merchandise no American packer sold or offered for sale cans of minced butter clams containing 7 ounces of meat, but that American packers did sell cans containing 3½ ounces of clams.

At this juncture counsel for the Government moved to dismiss these appeals on the ground that the plaintiff had not sustained the burden of proving either that the appraised value was erroneous, or that there was another dutiable value. The motion was taken under advisement by the trial judge.

The Government then offered in evidence the testimony of three witnesses. The first, Paul Shelley Guilford, testified that he had been engaged in the business of canning clams since 1908, and that he had canned so-called minced butter clams since 1923. He then testified in part as follows:

Q. What sizes do you sell of those minced butter clams?—A. We have sold 3½ ounces drained meat, 5 ounces of drained meat, 9 ounces of drained meat, and at times 50 ounces of drained meat.

Q. And could you have just as easily canned clams containing 7 ounces of drained meat if you wanted to?—A. We could have.

Q. All you needed was the proper can?—A. Yes.

Q. You at all times had the labor and the minced claims in your possession?—A. Yes.

Q. Did you at my suggestion, through Mr. Wager, the customs agent, figure out the price at which you would be willing to sell minced butter clams on January, 1935, in cans having seven ounces of drained meat content?—A. I did.

*  *  *  *  *  *  *

Q. Forty-eight cans to the case?—A. Forty-eight cans to the case, with a drained content of 7 ounces of minced butter clams, we would be willing to sell those for $6.60.

Q. Is that per case?—A. Per case, yes.

Judge DALLINGER. Would you freely offer them at that price to all customers at wholesale?

The WITNESS. Yes, sir.

*  *  *  *  *  *  *

Q. Now, Mr. Guilford, have you also figured out the price at which you would be willing to sell the same size minced butter clams in February 1936?—A. I figured this out for 1935 to 1937, inclusive.

Q. And the same price would prevail during that whole period?—A. The same price. * * *

Q. How many different types or brands of minced clams, limiting it to butter clams, did you sell during that period?—A. I think in that period we graded only two grades, Number 1 and Number 2.

* * * * * * *

Q. The price you quoted to me as the price you would have been willing to sell the seven ounce drained meat cans of minced butter clams was for the Number 1 grade; is that right?—A. Yes, that is for the Number 1.

* * * * * * *

Q. You did sell canned minced butter clams having a 3½ ounce drained meat content?—A. Yes.

Q. You are familiar with the prices of them all during the period from 1935 to 1937?—A. Yes.

Q. Will you tell us what price you did sell these 3½ ounce drained meat content of minced butter clams for at that time?—A. The average price and general price was $3.60 per case.

* * * * * * *

Q. Do you know the price you did receive for these clams?—A. The prices were $3.60 and $3.80.

* * * * * * *

Q. Tell me, at what periods of time between January 1935, and December 1937, at what periods of time did you sell these clams at $3.60 and at what periods did you sell them at $3.80, if you can?—A. I can't tell you that offhand.

On cross-examination the witness testified in part as follows:

X Q. How do you designate a can containing 3½ ounces of minced butter clams?—A. Halves.

X Q. Tell us the price at which you sold minced butter clams packed in halves on or about January 17, 1935?—A. January 25th, to William J. Goldberg of San Francisco, 50 cases halves at three sixty.

X Q. Of what kind of clams?—A. Minced butter clams.

X Q. What brand?—A. Sea Breeze.

X Q. Was there any difference in the price for Sea Breeze within the month prior to that from your books?—A. Well, December 12th, we sold a couple of hundred cases to the Merchants Wholesale Grocery for three eighty. * * *

* * * * * * *

X Q. What is the next prior sale to January 17, 1935 of the Royal Chef?—A. That was March 11th at three sixty.

* * * * * * *

X Q. During 1936, 1937, and 1938, did you sell the Royal Chef at a lower price than you sold the Sea Breeze brand during the corresponding period of time?—A. I don't think so.

* * * * * * *

X Q. You always sold the two at the same price?—A. Yes.

X Q. What is the difference between the Royal Chef brand and the Sea Breeze?—A. There is none.

X Q. What type do you put in your Sea Breeze brand of minced butter clams packed in halves?—A. First class clams.

X Q. And what type do you put in your Royal Chef brand?—A. Also first class clams.

* * * * * *

X Q. I am given to understand that the clams that you put into your Sea Breeze brand and Royal Chef brand are always the same as to color and size?—A. Yes.

At this juncture two cans of Royal Chef brand of minced butter clams were admitted in evidence as collective exhibit 1. It was also agreed by and between counsel for both parties in open court that the sales testified to by the Government witness are in the usual wholesale quantities.

X Q. Except for chain stores, do you restrict your sales to wholesale grocers?

*     *     *     *     *     *     *

A. I think I sold to one retailer   *   *   *.

*     *     *     *     *     *     *

X Q. Then I am given to understand that the balance of the stores to whom you made sales were wholesale grocers or to chain stores?—A. That is correct.

*     *     *     *     *     *     *

Judge DALLINGER. Mr. Witness,   *   *   *   were you willing at all times to sell at those prices you have given at wholesale to anyone that came along?

The WITNESS. Yes, sir.

Judge DALLINGER. Whether they were chain stores, whether they were wholesale grocers, or not?

The WITNESS. Quite true. I am willing to sell to anybody.

*     *     *     *     *     *     *

X Q. How many different sizes of cans containing minced butter clams were you selling during those years?—A. We packed 3½ ounces, 5 ounces, 9 ounces, and 50 ounces, and 8 ounces of whole and 50 ounces of whole clams.

X Q. In each of those various sizes—there are four of them; 3½ ounces, 5, 9, and 50—was the unit price per ounce for the clams the same?—A. The cost of the clams, themselves, was practically the same.

*     *     *     *     *     *     *

X Q. Having never packed seven ounces drained meat content of minced butter clams, how do you know that this price which you gave is a representative price?— A. Because it is the formula we use.

X Q. You sell all clams on the same formula?—A. Quite true.

X Q. Do you make a greater profit on your 3½'s or your 10's or 50's?   *   *   * A. No, they all run just about the same.

*     *     *     *     *     *     *

X Q.   *   *   *   when you use that formula either with respect to minced butter clams  or whole butter clams was your selling price per ounce on minced clams the same when packed in halves, namely 3½ ounces, or when packed 9 ounces, or when packed 5 ounces, or when packed 50 ounces to the tin?—A. No.

X Q. It varied with each size?—A. Sure, it varied with each size.

*     *     *     *     *     *     *

X Q. Where, in your opinion, is the principal market, or was the principal market for 3½ ounce minced butter clams?—A. I think Seattle had much more than any other State.

X Q. Your prices in Seattle for minced butter clams were lower than in San Francisco?—A. No; not necessarily.

X Q. Were they higher?—A. No.

X Q.   *   *   *   In estimating the price which you would be willing to receive for 7-ounce minced butter clams you included an item of $2.10 for the cost of the clams?—A. Yes.

X Q. Did that represent the cost of the quantity of clams required to make up 48 seven ounce cans?—A. That is correct.

\* \* \* \* \* \* \*

X Q. Does the cost of the clams alone in each of those various sizes vary according to the size?—A. Yes, it varies according to the size of the can. Each case requires a different amount.

X Q. Does the price per ounce vary?—A. The price per ounce of the clam in the raw doesn't vary.

X Q. But the cost of the clam in the can does?—A. It surely does.

The Government's second witness, Anphin A. Bugge, a clam packer associated with the Bugge Canning Co. having a cannery located on Puget Sound in the State of Washington, testified in part as follows:

Q. Did you during the period between January, 1935, and December 1937, can a commodity known as minced butter clams?—A. Yes.

Q. In what size cans or sizes did you can these minced butter clams?—A. In what they call halves, having a total content of seven ounces.

Judge DALLINGER. You mean seven ounces of meat?

The WITNESS. The total content is seven ounces of which 3½ is drained meat, \* \* \*.

Q. During the period from around January 1, 1935, to around December 31, 1937, did you at any time pack minced butter clams containing seven ounces of drained meat content?—A. No.

\* \* \* \* \* \* \*

Q. Will you tell us if you can during the month of January, 1935, at what price you sold seven ounce cans containing 3½ ounces of drained meat content of minced butter clams?—A. On January 14, 1935, we sold 50 cases to the Western States Grocery of Spokane at three fifty per case.

After testifying to other subsequent sales, the witness continued to testify in part as follows:

Q. Was this merchandise \* \* \* freely offered to all purchasers who desired to buy this merchandise?

\* \* \* \* \* \* \*

The WITNESS. Yes, sir.

Q. And all of these cases relate to the Moon Kissed Brand?—A. Yes.

\* \* \* \* \* \* \*

Q. Can you tell us at what price you would have been willing to receive had you packed and offered for sale seven ounces of drained meat minced clams consisting of minced butter clams during the period at or around January 17, 1937?

\* \* \* \* \* \* \*

A. The cost of packing minced butter clams in seven ounce tins at that time would be comparable for the price charged on the one pound Tall whole butter clams. During that period our price was $1.70 to $1.75.

\* \* \* \* \* \* \*

Q. Mr. Bugge, you were here when Mr. Guilford testified?—A. Yes.

\* \* \* \* \* \* \*

Q. Would you be willing to sell your minced butter clams packed seven ounces of drained weight to the can at the price he said, which is six sixty, during that period of time?—A. I believe I would name a little higher price, six eighty, at least.

Q. Did that price remain steady during 1935 and between 1935 and 1937?—A. Yes, there would not be much fluctuation.

On cross-examination the witness testified in part as follows:

X Q. Will you tell me, Mr. Bugge, what the real facts are so far as whether or not you sell to stores other than wholesale grocers?—A. To the best of my knowledge we do not sell to anybody except jobbers or those entitled to jobbers' buying privileges.

Judge DALLINGER. Does that mean you would not sell to anybody?

'The WITNESS. We confine our business entirely to the wholesale jobbers. We do not sell to retail stores.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Judge DALLINGER. Would you refuse to sell to retailers if they came to you to buy?

The WITNESS. We might take the order and put it through a jobber but as packers it is our policy to sell to the wholesale trade &ast; &ast; &ast; .

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

The third Government witness, Francis A. Bugge, testified that he had been engaged in the packing of minced butter clams since 1919; that during the period from January 17, 1935, to December 28, 1937, he had sold minced butter clams 3½ ounces drained meat to the can; that his price in January 1935, was $3.60 per case, in February and October 1936, $3.70 per case, and in December 1937, $4 per case; that he sold mostly to wholesale dealers and only occasionally to retail stores; that he never packed any minced butter clams 7 ounces drained meat content to the can; that during the packing season he always had a sufficient supply of minced butter clams to fill any orders; that on January 17, 1935, he would have been willing to have sold minced butter clams packed 7 ounces of drained meat to the can, 48 cans to the case, in the usual wholesale quantities at $6.72 per case; that in February and October of 1936 his price would have been $7.40 per case of 48 cans; and that in December 1937, he would have been willing to receive $8 per case of 48 cans.

On cross-examination the witness testified that his advertised brand was the "FAB" brand, a sample of which was admitted in evidence as exhibit 2. He then proceeded to testify in part as follows:

X Q. &ast; &ast; &ast;. In stating the price at which you would be willing to sell the hypothetical seven ounces, did you just double your price for the 3½ ounces?— A. That's right.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. As a matter of fact, you are packing these minced clams or at least you started packing these minced clams to meet the competition of the Alaska minced razor clam, didn't you?—A. No; I packed them more to make a living, more than anything. When we started packing we sold them at $1.15 a dozen, the minced halves.

X Q. I have here, Mr. Bugge, a transcript of the testimony given by you, or in part given by you, before Jeffrey Heiman, Commissioner for the United States Tariff Commission in the matter of an investigation of canned clams, under Section 336, in which at page 94, the following questions and answers were given by you:

Q. As I understand it, Mr. Bugge, the principal competition that is really causing, according to your statements, the trouble in the clam industry on the

Pacific Coast is the Japanese competition?—A. That is what started it, but now on minced clams—I have been forced out of the whole clam market, and I have been trying to get into the minced clam market, and I am finding competition there.

Q. Competition from where, may I ask?—A. For instance, there is a ten cent razor clam—a razor clam being sold on the market for ten cents.

\*          \*          \*          \*          \*          \*          \*

X Q. Did that competition between minced butters and minced razors, did that competition exist in 1935, 1936, and 1937?—A. No, I forgot about them.

X Q. You told us how prices are controlled or affected by competition. What article was in competition, or what minced clam was in competition with your minced butters?

Judge DALLINGER. You mean in 1935?

Mr. TUTTLE. During 1935, 1936, and 1937.

A. Well, I guess it was just a matter of our own clams.

\*          \*          \*          \*          \*          \*          \*

At the fourth and last hearing, held at San Francisco on November 26, 1941, counsel for the plaintiff offered in evidence a can labeled "Namco Fancy Minced Ocean Clams" which was admitted in evidence as illustrative exhibit A, as representative of the size of the can in which the minced clams involved in these appeals were imported.

The plaintiff then offered the testimony of two witnesses. The first, Richard D. Higgs, senior entry clerk at the San Francisco customhouse, testified that it was part of his duties when entries were filed with the collector to designate certain packages for examination by the appraiser; that in reappraisement appeal 119515–A there was 1 package out of 40 designated for examination; that in reappraisement appeal 119537–A there was 1 package out of 150 packages designated for examination; that in reappraisement appeal 121980–A there was 1 package out of 175 packages designated for examination; and that in reappraisement appeal 127027–A there was 1 package out of 96 packages designated for examination.

On cross-examination the witness testified in part as follows:

X Q. Did you have any special regulation or any Treasury decision that excepted this merchandise from the regulations that require examination of one out of ten packages?—A. Section 499 of the tariff act provides that on authorization from the Secretary of the Treasury a lesser number may be designated. I believe at that time a less number was designated on fish and the interpretation at that time, that is our interpretation at that time, was that a clam was fish.

X Q. Did you take any steps to ascertain that fact before you made the designation in these importations?—A. Yes, we consulted the dictionary.

On redirect examination the witness testified in part as follows:

R Q. You have told us there was some kind of a document relating to fish upon which you relied for this designation.—A. They publish decisions at intervals designating certain merchandise that may be examined by less than one package in ten packages. \* \* \* I can give you the present T. D.

R Q. What is it?—A. T. D. 49412.

R Q. What is the date of that, roughly?—A. I haven't the date; I should imagine it was in 1938.

R. Q. These importations were made in 1935 and 1936, and on January 24, 1938.—A. I can't tell you what the Treasury Decision was that was applicable at that time.

\* \* \* \* \* \* \*

R. Q. Did that socalled regulation refer to fish or shell fish?—A. It related to fish, fresh, frozen, or prepared in any manner.

R. Q. Do you recall whether it was published in the form of a letter?—A. It was published by the Treasury Department. I am quite sure that was published.

\* \* \* \* \* \* \*

R. Q. You have no recollection, Mr. Higgs, of the form of the document, whatever it may have been, whether a letter or a published decision, or anything else?—A. What was the date?

R. Q. 1935, 1936, and January, 1938.—A. No, I would not be able to say.

When the hearing was resumed after recess, the following colloquy took place:

Mr. TUTTLE. This is the case, Your Honor, in which the assistant deputy collector testified this morning in respect to the designation of certain packages. He has now returned to court and has advised me that the assistant collector in charge at San Francisco believes that the witness can give no further testimony on this subject on the ground that any such testimony would be prejudicial to the public interest. \* \* \* it would appear that testimony of the character we are seeking to offer here which has always been received over a great many years by this court does not in any way prejudice the public interest.

\* \* \* \* \* \* \*

Judge DALLINGER. I think the witness ought to be permitted to answer whether he knows of such a letter which is the one in question.

The witness, Richard D. Higgs, then being called to the stand, proceeded to testify in part as follows:

Mr. TUTTLE. Will the court ask the question?

Judge DALLINGER. Yes, I will ask him. Mr. Higgs, do you know of any letter from the Treasury Department, the Secretary of the Treasury, or anyone acting for him, other than the published decisions?

The WITNESS. I have seen copies of several letters, Your Honor, about 1930, signed by Seymour Lowman, Assistant Secretary of the Treasury. The original letter was from the——

Mr. SPECTOR. I object to this. \* \* \*

Mr. TUTTLE. I think the witness should be permitted to proceed with his answer.

Judge DALLINGER. It seems to me that the government officials ought to produce the letter if there is such a letter. \* \* \*

\* \* \* \* \* \* \*

In other cases, they produced the original or a copy of the original letter or telegram on which they relied for their action, and then the appellate court decided it was the burden of the plaintiff to prove that the letter or telegram had not been promulgated. If there is nothing before the court, no letter, it seems to me that the plaintiff is protected. I cannot act on something which is not before the court.

Mr. TUTTLE. Would Your Honor inquire of the witness whether the failure to designate one out of ten packages of this merchandise during 1935, 1936, 1937, and January 1938, was because of the fact the collector had in his possession a letter telling him not to do so?

Judge DALLINGER. Yes, I will ask him whether he relied on some letter. Did you?

The WITNESS. We did, Your Honor.

Judge DALLINGER. Now, if the Government doesn't produce it, it is not before the court. There is no evidence before the court except the statement of the witness that he relied on a letter. If that letter is not produced, it is not before the court. If I were counsel for the Government, I would want that letter to go in evidence.

The plaintiff's second witness, Edward Christian Binder, a customs broker for the past 20 years, testified that for the past 15 years he had spent every day on the floor of the customhouse, with the exception of his vacation period; that he was familiar with the method by which notices of interest were given to importers and brokers; that there were two blackboards on the floor of the customhouse on which notices were posted; that he did not think that any notice relating to the exemption from designation under section 499 of the tariff act of any type of merchandise to be ordered up to the appraisers' stores for examination had ever been posted on said blackboards; that each customsbroker has a box on the floor of the customhouse in which notices are deposited, and that he had never received any notice pertaining to the same in his box; that he was a member of the firm of Hoyt, Shepston & Sciaroni; and that his firm has acted as customs brokers for five or six importers of Japanese canned clams.

On cross-examination he testified that in his opinion there never had been any regulation concerning the examination and designation of merchandise composed of shellfish.

Upon this record I find as a fact that in all of the instant reappraisement appeals the collector failed to designate and the appraiser failed to examine at least 1 out of every 10 packages of merchandise herein, as required by section 499 of the Tariff Act of 1930, the pertinent provisions of which read as follows:

* * *. The collector shall designate the packages or quantities covered by any invoice or entry which are to be opened and examined for the purpose of appraisement or otherwise and shall order such packages or quantities to be sent to the public stores or other places for such purpose. Not less than one package of every invoice and not less than one package of every ten packages of merchandise, shall be so designated unless the Secretary of the Treasury, from the character and description of the merchandise, is of the opinion that the examination of a less proportion of packages will amply protect the revenue and by special regulation permit a less number of packages to be examined.

Counsel for the plaintiff in their brief filed herein state that in reappraisement appeal .127027–A the appraisement occurred after the passage of the Administrative Act of 1938 amending section 499 of the Tariff Act of 1930, and that consequently the insufficient designation is immaterial. An examination of the papers, however, discloses

the fact that the appraisement in question was made on July 8, 1938, whereas section 37 of said Administrative Act of 1938 reads:

SEC. 37. Sections 31 and 34 of this Act shall take effect on the date of enactment of this Act. Except as otherwise specially provided in this Act, the remainder of this Act shall take effect on the thirtieth day following the date of its enactment.
Approved, June 25, 1938.

Inasmuch as all of the other sections of said administrative act, except sections 31 and 34, including section 16 (a) which is the section modifying section 499 of the Tariff Act of 1930, did not take effect until 30 days after June 25, 1938, namely July 25, 1938, it follows that the appraisement in reappraisement appeal 127027–A was not affected by the provisions of said Administrative Act of 1938.

The witness Higgs testified that the designation and examination of less than 1 package out of every 10 packages was not made because of a special regulation promulgated by the Acting Secretary of the Treasury Wayne C. Taylor, promulgated in T. D. 49412, 73 Treas. Dec. 306, in which, among other articles of merchandise, is included fish, fresh or frozen, dried, in brine, or prepared or preserved in any manner. He testified that in his opinion clams were fish, and cited as his authority certain dictionary definitions in which clams are included within the general term fish. Unfortunately, however, the Congress has definitely excluded clams from the term fish in paragraph 720 (c) of the Tariff Act of 1930, which reads as follows:

The term "fish" as used in this Act, does not include shellfish.

This court is certainly justified in taking judicial notice that clams are a species of shellfish.

Moreover, even if this were not so, the special regulation, T. D. 49412, is dated February 14, 1938, which is subsequent to all of the dates of entry herein, and therefore has no possible application thereto.

The witness Higgs further testified that he understood there was a special letter sent to the collector of customs signed by the Secretary of the Treasury which might be considered a special regulation within the meaning of section 499. Although called upon to produce such a letter, the Government failed to do so. Thereupon, plaintiff's witness Binder, a customs broker of long practice at the customhouse at San Francisco, testified that no letter or other document in the nature of a special regulation under said section 499 has ever been posted on either of the bulletin boards in the San Francisco customhouse or deposited in his customs broker's box therein.

In the face of uncontradicted evidence that the mandatory provisions of said section 499 had not been complied with, it was plainly incumbent upon the Government to prove the existence of a special regulation modifying said section 499. It is true that if the Government had done so, then the burden would have been upon the plaintiff to prove that such special regulation had not been properly promulgated.

Both this court and the Court of Customs and Patent Appeals have repeatedly held that the provision in said section 499 for the designation and examination of at least 1 out of every 10 packages of imported merchandise is mandatory, and have held that in cases where there has been a failure to comply with such mandatory provision the appraisement should be declared null and void, in which case the collector should liquidate on the entered value. *United States* v. *V. W. Davis*, 20 C. C. P. A. 305, T. D. 46087; *United States* v. *F. W. Woolworth Co.*, 22 C. C. P. A. 184, T. D. 47126; *United States* v. *C. J. Tower & Sons*, 24 C. C. P. A. 456, T. D. 48912. It was on the authority of these cases that counsel for the plaintiff moved that the appraisements herein be declared null and void, which motion is hereby granted.

Counsel for both the plaintiff and the Government, in their briefs filed herein, contend, however, in spite of the fact that the appraisements herein were null and void *ab initio* the court must nevertheless proceed to find values for the merchandise at bar, to wit, either values based on the American selling price, as contended for by the Government, or export values which, by stipulation, are the invoiced values herein, as contended for by the plaintiff. In support of such contentions counsel cites the case of *Arkell Safety Bag Co.* v. *United States*, 24 C. C. P. A. 27, T. D. 48307. I have carefully read the decision in that case and in my opinion it has no application to the facts established herein. In that case there was an appraisement of the merchandise, whereas in the instant case the appraisements were null and void *ab initio*, and therefore there was nothing from which an appeal could legally be filed.

Nevertheless, counsel for the Government in his brief filed herein contends that the plaintiff has failed to overcome the presumption of correctness attaching to the appraised value. It is manifest, however, that no presumption of correctness exists in the instant case, for the good and sufficient reason that a void appraisement has no presumption. As was aptly said by Brown, Judge, in *Mitsubishi Shoji Kaisha, Ltd.* v. *United States*, Reap. Dec. 4570, 2 Cust. Ct. 935, "No statutory presumption then attaches to it. It is the same as if it were not there. Presumptions from nothing do not presume very far. We do not live with Alice in Wonderland."

Counsel for the Government in his brief filed herein also argues at length that because the President, in his proclamation published in T. D. 47031, *supra*, has decreed that the American selling price is the basis for determining the value of Japanese minced clams, therefore this court willy nilly must find an American selling price for the merchandise herein.

It is to be noted, however, that the President, in and by the provisions of the statute under which he acted, is restricted to declaring

an American selling price as the proper basis for determining the value of the imported canned minced clams herein like or similar to domestic canned minced clams. I am precluded, however, from determining whether the domestic minced clams chosen by the appraiser for determining the value of the imported clams are like or similar to the Japanese minced clams imported herein or any other factors relating to value. Inasmuch as the collector and appraiser failed to comply with the mandatory provisions of section 499 of the Tariff Act of 1930, the appraisements herein are null and void *ab initio*, and I so hold. *United States* v. *Daniel F. Young, Inc.* (*Minobu Trading Corp.*), 27 C. C. P. A. 124 at p. 131, C. A. D. 73; *Mitsubishi Shoji Kaisha, Ltd.* v. *United States*, Reap. Dec. 4570, 2 Cust. Ct. 935, concurring opinion by Keefe, J., at pp. 942–949.

Judgment will be rendered accordingly.